# United States Court of Appeals for the Federal Circuit

---

**CASCADES PROJECTION LLC,**
*Appellant*

**v.**

**EPSON AMERICA, INC., SONY CORPORATION,**
*Appellees*

---

2017-1517, 2017-1518

---

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2015-01206, IPR2015-01846.

---

## ON PETITION FOR HEARING EN BANC

---

PHILIP P. MANN, Mann Law Group, Seattle, WA, filed a petition for hearing en banc for appellant. Also represented by ROBERT GREENSPOON, Flachsbart & Greenspoon, LLC, Chicago, IL.

DAVID J. BALL, JR., Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, filed a response to the petition for appellee Epson America, Inc. Also represented by NICHOLAS P. GROOMBRIDGE, JENNY CHIA CHENG WU, New York, NY.

2        CASCADES PROJECTION LLC v. EPSON AMERICA, INC.

KEVIN P.B. JOHNSON, Quinn Emanuel Urquhart & Sullivan, LLP, Redwood Shores, CA, filed a response to the petition for appellee Sony Corporation. Also represented by ANDREW J. BRAMHALL; MATTHEW A. SMITH, Turner Boyd LLP, Redwood City, CA.

ANDREW JOHN DHUEY, Berkeley, CA, for amici curiae Daniel R. Cahoy, Eric R. Claeys, Gregory Dolin, James W. Ely, Jr., Richard A. Epstein, Matthew P. Harrington, Ryan Holte, Irina D. Manta, Adam Mossoff, Sean M. O'Connor, Kristen J. Osenga, Mark Schultz, Peter K. Yu.

FREAR STEPHEN SCHMID, San Francisco, CA, for amici curiae Security People Inc., Edison Innovators Association, Independent Inventors of America, Inventors Network of the Capital Area, Inventors Network of the Carolinas, Inventors Network of Minnesota, Inventors' Roundtable, Inventors Society of South Florida, Music City Inventors, National Innovation Association, San Diego Inventors Forum, South Coast Inventors, Tampa Bay Inventors Council, US Inventor, Inc.

————————

Before PROST, *Chief Judge*, NEWMAN, LOURIE, DYK, MOORE, O'MALLEY, REYNA, WALLACH, TARANTO, CHEN, HUGHES, and STOLL, *Circuit Judges*.

NEWMAN, *Circuit Judge,* concurs in the denial of the petition for initial hearing en banc.

DYK, *Circuit Judge,* with whom, PROST, *Chief Judge,* and HUGHES, *Circuit Judge*, join, concurs in the denial of the petition for initial hearing en banc.

O'MALLEY, *Circuit Judge,* dissents from the denial of the petition for initial hearing en banc.

REYNA, *Circuit Judge,* dissents from the denial of the petition for initial hearing en banc.

PER CURIAM.

# O R D E R

Appellant Cascades Projection LLC filed a petition for hearing en banc. A response to the petition was invited by the court and filed by appellees Epson America, Inc. and Sony Corporation. Appellant was also granted leave to file a reply in support of the petition.

The petition was referred to the circuit judges who are in regular active service.

Upon consideration thereof,

IT IS ORDERED THAT:

The petition for hearing en banc is denied.


FOR THE COURT

May 11, 2017                    /s/ Peter R. Marksteiner
   Date                         Peter R. Marksteiner
                                Clerk of Court

# United States Court of Appeals
# for the Federal Circuit

---

**CASCADES PROJECTION LLC,**
*Appellant*

**v.**

**EPSON AMERICA, INC., SONY CORPORATION,**
*Appellees*

---

2017-1517, 2017-1518

---

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2015-01206, IPR2015-01846.

---

NEWMAN, *Circuit Judge*, concurring in the denial of initial hearing en banc.

There is no doubt that a patent is a property right, with the attributes of personal property. This was resolved in 35 U.S.C. § 261 ("Subject to the provisions of this title, patents shall have the attributes of personal property . . . "). There is, of course, a public interest in the innovation incentive of the patent law, *see, e.g., Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 604 (Fed. Cir. 1985), but that does not convert a private right into a public right. That is not the question presented by the current debate concerning the America Invents Act.

Because "the attributes of personal property" enjoyed by patents are "[s]ubject to the provisions of this title," the inquiry focuses on whether patent owners subject to post-grant procedures are afforded appropriate due process protections as the Patent Office ensures issued patents do indeed conform with the provisions of the Patent Act.  The question, then, is whether the statutory scheme created by the America Invents Act, in which the Office is given an enlarged opportunity to correct its errors in granting a patent, with its decision subject to review by the Federal Circuit, meets the constitutional requirements of due process in disposition of property.

In view of the uncertainties illustrated in the present debate, I conclude that the matter should be resolved after full opportunity for panel consideration, and, as such, concur in the denial of initial en banc hearing.  If necessary to properly resolve these uncertainties, however, resolution by the court en banc is appropriate.

# United States Court of Appeals
# for the Federal Circuit

———————————

**CASCADES PROJECTION LLC,**
*Appellant*

**v.**

**EPSON AMERICA, INC., SONY CORPORATION,**
*Appellees*

———————————

2017-1517, 2017-1518

———————————

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2015-01206, IPR2015-01846.

———————————

DYK, *Circuit Judge* with whom PROST, *Chief Judge*, and HUGHES, *Circuit Judge*, join, concurring in the denial of initial hearing en banc.

We concur in the court's denial of the petition for initial hearing en banc. The petition raises the same constitutional challenge to the inter partes review provisions of the America Invents Act that the court rejected in *MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284 (Fed. Cir. 2015), *cert. denied* 137 S. Ct. 292 (2016). *MCM* was correctly decided, and there is no need to restate *MCM's* reasoning here. We write solely to address three points raised by today's dissents.

First*, MCM* is neither "inconsistent" nor "irreconcilable" with the court's decision in *Patlex Corp. v. Mossing-*

*hoff*, 758 F.2d 594 (Fed. Cir. 1985). Slip op. 2 (Reyna, J., dissenting). In *Patlex*, the court upheld the constitutionality of ex parte reexaminations conducted by the PTO. In doing so, the court expressly affirmed the power of an Article I tribunal to adjudicate, in the first instance, the validity of an issued patent. *See Patlex*, 758 F.2d at 604. *MCM* faithfully followed the reasoning of *Patlex* to reach the same conclusion with respect to inter partes review.

Second, *Patlex* and *MCM* did not differ in their interpretation of *McCormick Harvesting Machine Co. v. Aultman*, 169 U.S. 606 (1898). On its face, the decision in *McCormick* rested on the lack of statutory authority: "Our conclusion upon the whole case is that, upon the issue of the original patent, the patent office had no power to revoke, cancel, or annul it. It had lost jurisdiction over it, and did not regain such jurisdiction by the application for a reissue." *Id.* at 612.

Both *Patlex* and *MCM* distinguished *McCormick* as resting on a lack of statutory authority, statutory authority which was later conferred by a series of statutes culminating in ex parte reexamination and, later, inter partes review. As explained by the court in *Patlex*:

> We do not read *McCormick Harvesting* as forbidding Congress to authorize reexamination to correct governmental mistakes, even against the will of the patent owner. A defectively examined and therefore erroneously granted patent must yield to the reasonable Congressional purpose of facilitating the correction of governmental mistakes. This Congressional purpose is presumptively correct, and we find that it carries no insult to the Seventh Amendment and Article III.

758 F.2d at 604. *MCM* adopted this exact reasoning in upholding the constitutionality of inter partes review. *See MCM*, 812 F.3d at 1291 (quoting *Patlex* 758 F.2d at 604).

Third, contrary to the dissents, there is no inconsistency in concluding that patent rights constitute property and that the source of that property right is a public right conferred by federal statute. *See* Slip op. 2 (O'Malley, J., dissenting); Slip op. 19–23 (Reyna, J. dissenting). The Supreme Court has repeatedly recognized that patent rights are public rights flowing from congressional legislation. In a decision pre-dating *McCormick*, the Court observed that:

> The [patent] monopoly did not exist at common law, and the rights, therefore, which may be exercised under it cannot be regulated by the rules of the common law. It is created by the act of Congress; and no rights can be acquired in it unless authorized by statute, and in the manner the statute prescribes.

*Gayler v. Wilder*, 51 U.S. (10 How.) 477, 494 (1850). The recognition of patent rights as grounded in statutory law remains to this day. *See Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 229 n.5 (1964) ("Patent rights exist only by virtue of statute.").

The Supreme Court has also repeatedly made clear that such public rights may be adjudicated in the first instance by an administrative agency. For example, most recently in *Stern v. Marshall*, 564 U.S. 462, 491 (2011), the Court concluded that the public rights doctrine extends to "cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority."[1]  There is no dispute that the issue of patent

---

[1]    *See also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54 (1989); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 856 (1986); *Thomas v. Union*

4                CASCADES PROJECTION LLC v. EPSON AMERICA, INC.

validity "derives from a federal regulatory scheme" and is "integrally related to particular federal government action." *Stern*, 492 U.S. at 490–91.

--------------------------------------------------------

*Carbide Agric. Prods. Co.*, 473 U.S. 568, 584 (1985); *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69–70 (1982); *Crowell v. Benson*, 285 U.S. 22, 50 (1932); *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1855).

# United States Court of Appeals for the Federal Circuit

———————————

## CASCADES PROJECTION LLC,
*Appellant*

**v.**

## EPSON AMERICA, INC., SONY CORPORATION,
*Appellees*

———————————

## 2017-1517, 2017-1518

———————————

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2015-01206, IPR2015-01846.

———————————

O'MALLEY, *Circuit Judge*, dissenting from the denial of initial hearing en banc.

In *MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284 (Fed. Cir. 2015), a panel of this court stated that "patent rights are public rights." *Id*. at 1293. We did so in the context of rejecting a constitutional challenge to inter partes review ("IPR"), a new post-grant proceeding created by the Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("the AIA"). In an IPR proceeding, third parties can challenge the validity of issued patent rights before the Patent Trial and Appeal Board of the United States Patent and Trademark Office ("PTO") without plenary Article III trial court review of the decision. The Supreme Court has explained that

"public rights" may be assigned to a non-Article III forum for resolution without violating the Constitution, but that core private rights are only subject to adjudication in Article III courts. *Stern v. Marshall*, 564 U.S. 462, 484-86 (2011). By characterizing a patent as a public right, therefore, the panel in *MCM* was able to conclude that patent validity is "susceptible to review by an administrative agency"—in other words, that IPR proceedings do not violate the Constitution. 812 F.3d at 1293.

Cascades Projection LLC petitions this court to resolve whether a patent right is a public right en banc. For the reasons Judge Reyna outlines in Parts I and II.A of his thoughtful dissent, I believe it is far from certain that *MCM*'s underlying premise—that patent rights *are* public rights—is correct. Because that issue is both sufficiently debatable and exceptionally important, I dissent from the court's refusal to consider it en banc in the first instance.

The Supreme Court has acknowledged that "[p]atents . . . have long been considered a species of property." *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 642 (1999) (Patents "are surely included within the 'property' of which no person may be deprived by a State without due process of law."). In the takings context, the Supreme Court has recognized that "the rights of a party under a patent are his private property" which "cannot be taken for public use without just compensation." *Brown v. Duchesne*, 60 U.S. 183, 197 (1857). Recently, the Court reaffirmed that a patent "confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser." *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427 (2015) (quoting *James v. Campbell*, 104 U.S. 356, 358 (1882)).

The Supreme Court has stated that "[t]he only authority competent to set a patent aside, or to annul it, or to correct it for any reason whatever, is vested in the courts of the United States, and not in the department which issued the patent." *McCormick Harvesting Mach. Co. v. Aultman*, 169 U.S. 606, 609 (1898). As Judge Reyna points out, *McCormick* may suggest that the PTO does not have the authority to invalidate issued patents through IPR proceedings and that Article III adjudication is required. *See also* Michael I. Rothwell, *After MCM, A Second Look: Article I Invalidation of Issued Patents for Intellectual Property Still Likely Unconstitutional After Stern v. Marshall*, 18 N.C.J.L. & Tech. On. 1, 18 (2017). Because *MCM* might be at odds with long-standing Supreme Court precedent, I believe we should take this opportunity to reconsider our decision.[1]

––––––––––––––––––

[1]    Two Supreme Court Justices recently expressed an interest in the public versus private rights distinction in the trademark context. *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1316-17 (2015) (Thomas, J., dissenting). Justice Thomas, joined by Justice Scalia, stated that "[t]rademark registration under the Lanham Act has the characteristics of a quasi-private right" and that, because registration is a "statutory government entitlement, no one disputes that the [Trademark Trial and Appeal Board] may constitutionally adjudicate a registration claim." *Id.* at 1317. But the "right to adopt and exclusively use a trademark appears to be a private property right that 'has been long recognized by the common law and the chancery courts of England and of this country.'" *Id.* at 1317 (quoting *Trade-Mark Cases*, 100 U.S. 82, 92 (1879)). Given this historical framework, Justice Thomas stated that "it appears that the trademark infringement suit at issue in this case might be of a type that must be decided by 'Article III judges in Article

For these reasons, I dissent from the court's refusal to consider en banc whether a patent right is a public right. Expressing no definitive opinion on the merits, it seems to me that this case raises exceptionally important questions of constitutional law and separation of powers principles that warrant our careful consideration. Indeed, the Supreme Court has warned that allowing Congress to confer judicial authority outside Article III "compromise[s] the integrity of the system of separated powers and the role of the Judiciary in that system." *Stern*, 564 U.S. at 503. Because these issues are complex and could have far reaching consequences, they deserve the attention of the full court. I respectfully dissent.

---

III courts.'" *Id.* (quoting *Stern*, 564 U.S. at 484). Accordingly, at least some members of the Court have expressed an interest in the interplay between the public versus private rights distinction and administrative agency authority. Because the issue presents itself here in the patent context, we should address it head on.

# United States Court of Appeals
# for the Federal Circuit

———————————

**CASCADES PROJECTION LLC,**
*Appellant*

**v.**

**EPSON AMERICA, INC., SONY CORPORATION,**
*Appellees*

———————————

2017-1517, 2017-1518

———————————

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2015-01206, IPR2015-01846.

———————————

REYNA, *Circuit Judge,* dissenting from denial of initial hearing *en banc.*

Cascades petitions this court to address *en banc* the exceptionally important question of whether the United States Constitution prohibits the Patent Trial and Appeal Board from canceling patents through its inter partes review process. I would grant Cascades' petition and respectfully dissent from today's order to the contrary.

The state of current law compels *en banc* review. First, undisturbed Supreme Court precedent addresses the question at hand: "The only authority competent to set a patent aside, or to annul it, or to correct it for any reason whatever, is vested in the courts of the United

States, and not in the department which issued the patent." *McCormick Harvesting Mach. Co. v. C. Aultman & Co.*, 169 U.S. 606, 609 (1898) (citation omitted).

Second, two inconsistent and irreconcilable Federal Circuit precedential opinions, which purport to distinguish *McCormick*, hold that the United States Patent and Trademark Office retains power to revoke, cancel, or annul any original patent it issues. *McCormick* was decided over a century ago. By contrast, the two Federal Circuit decisions and the America Invents Act, which gave birth to inter partes review, are much more recent.

Third, the separation of powers weighs in the balance. The core of this dispute involves substantial questions of property rights, Article III, and the Seventh Amendment. Thus, while this matter involves a significant question of federal patent law, its reach is beyond patent law. Specifically, we should consider the constraints Article III imposes on the adjudication of patent rights by an administrative authority. We should not ignore these important questions that lie at our doorstep.

To understand the relationship between patents, pertinent stakeholders, and these questions, we must first look at the circumstances that existed when the Patent Clause was made part of the Constitution. Hence, we start at the founding of our nation.

## I. The Patent Clause

The Constitution empowers Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. The Patent Clause is unique in several aspects. It grants Congress authority in such particularized detail to render the clause an imperative: to secure an exclusive right. And of the many clauses in Section 8, this is the only one to specify not only the ends

(promotion of the progress of science and the useful arts) but the means (issuance of patents).

### A.  Patent Clause Debate

The simplicity of the language of the Patent Clause has obscured the underlying debate over time.  There is no doubt that the link between patents and the promotion of "the Progress of Science and useful Arts" has proven prescient.  Yet, consider that the Patent Clause came into being only after attempts to promote the progress of science and useful arts by the establishment of a national university failed.  *See* Dotan Oliar, *Making Sense of the Intellectual Property Clause: Promotion of Progress as a Limitation on Congress's Intellectual Property Power*, 94 GEO. L.J. 1771, 1792–94 (2006) (summarizing James Madison's rejected proposal for a national university).  While the draft text calling for a constitutional establishment of a national university was relegated to the debate dustbin, the phrase "[t]o promote the Progress of Science and useful Arts" was, much to Thomas Jefferson's chagrin, rescued from the cutting room floor and combined with "by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries" to create the Patent Clause.  *See id.* at 1776, 1804–05 (summarizing Jefferson's opposition to the Patent Clause).

Indeed, what little debate there was on the Patent Clause was intense, substantive, and almost entirely focused on uncertainties about the creation of an exclusive right and its links to the establishment of a private monopoly.  Madison was correct when he wrote that the utility of patents "will scarcely be questioned."  THE FEDERALIST No. 43, at 338 (James Madison) (John C. Hamilton ed., J. B. Lippincott & Co. 1804).  Though the Framers generally disfavored monopolies, Madison argued that monopolies for "literary works and ingenious discoveries" are "too valuable" to be "wholly renounced."

14 THE PAPERS OF THOMAS JEFFERSON (Julian P. Boyd ed., 1956) (Oct. 17, 1788 letter from Madison to Jefferson). He believed that "[t]he right to useful inventions seems . . . to belong to the inventors" because patents foster the public good. THE FEDERALIST No. 43, at 338 (James Madison). On the other side of the debate, Benjamin Franklin staunchly opposed monopolies, writing that "as we enjoy great advantages from the inventions of others, we should be glad of an opportunity to serve others by any invention of ours; and this we should do freely and generously." BENJAMIN FRANKLIN, 1 THE COMPLETE WORKS OF BENJAMIN FRANKLIN 223–24 (John Bigelow ed. 1887). Of course, not everyone would be so free and generous with their inventions without an opportunity to profit through a limited monopoly. Recognizing a tradeoff was required—promotion of free thought and creativity for the public, and a secured right for the inventor—the Framers unanimously voted to adopt the Patent Clause. In doing so, the Framers calmed the uncertainty about monopolies in clear, simple words: the Constitution granted Congress authority to create for a limited time a personal right of exclusivity. In my view, Congress was more than empowered to act—the American people spoke and told Congress to act in a specific and particularized way.

### B. The Patent As A Private Property Right

At the time the Constitution went into effect, the patent was considered more than a public good and in brief time became a recognized property right. In eighteenth century America, patents were considered "privileges." Adam Mossoff, *Who Cares What Thomas Jefferson Thought About Patents? Reevaluating the Patent "Privilege" in Historical Context*, 92 CORNELL L. REV. 953, 990 (2007) ("Mossoff"). At that time, "privileges" were "civil rights in property afforded expansive and liberal protection under the law." *Id.* This civil property right, which the Constitution instructs Congress to "secur[e]," stands in stark contrast to the "grant" of patents in England.

*McKeever v. United States*, 14 Ct. Cl. 396, 421 (1878) ("Congress are not empowered to grant to inventors a favor, but to secure to them a right."); Mossoff at 991 ("Throughout the nineteenth century, courts reaffirmed their view of patents as civil rights on par with contract and property rights similarly identified as privileges.").

That patents are property is now "beyond reasonable debate." *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 599 (Fed. Cir. 1985); *see Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 642 (1999) ("Patents . . . have long been considered a species of property.") (citation omitted); *Ex parte Wood*, 22 U.S. (9 Wheat.) 603, 608 (1824) ("The inventor has, during this period [of patent monopoly], a property in his inventions; a property which is often of very great value, and of which the law intended to give him the absolute enjoyment and possession."); *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011) (courts may not "entirely ignore the fundamental nature of patents as property rights granting the owner the right to exclude"); 35 U.S.C. § 261 ("[P]atents shall have the attributes of personal property.").

The Supreme Court has long held the view that patents are private rights worthy of protection. *See Grant v. Raymond*, 31 U.S. (6 Pet.) 218, 222 (1832) (constitutional imperative to secure the "progress of useful arts" led the Supreme Court to endorse reissued patents before Congress ever provided statutory authority to do so). Patent rights vest such that subsequent repeals of a patent statute cannot impact an issued patent. *McClurg v. Kingsland*, 42 U.S. (1 How.) 202, 206 (1843). And the Supreme Court has warned this court to remember "the settled expectations of the inventing community." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabuyshiki Co.*, 535 U.S. 722, 739 (2002). *Grant*, *McClurg*, and *Festo* all show how patent rights cannot be separated from any other type of property right. For as we have said previously,

"[p]atent law is not an island separated from the main body of American jurisprudence." *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1351 (Fed. Cir. 2004) (*en banc*).

*Amici* lend support. They point out that "[s]ince the Antebellum Era in the early nineteenth century, the Supreme Court and Circuit Courts repeatedly and consistently defined patents as constitutionally protected *private rights*—specifically, as *private property rights*." 13 Law Professors' *Amicus Curiae* Brief at 2 (emphasis in original). As private property, patents are protected by the Fifth Amendment against uncompensated government takings. *See Horne v. Dep't of Agriculture*, 135 S. Ct. 2419, 2427 (2015) (personal property, including patents, is not "any less protected against physical appropriation than real property"); *James v. Campbell*, 104 U.S. 356, 358 (1882) ("[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser . . . ."); 28 U.S.C. § 1498(a) (granting the United States Court of Federal Claims jurisdiction to adjudicate patent infringement suits against the federal government under a takings theory).[1] And patents are protected against violations of due process pursuant to the Fourteenth Amendment. *Fla. Prepaid*, 527 U.S. at 642 ("[Patents] are surely included within the 'property' of which no person may be deprived by a State without due process of law.").

---

[1]    For more detail, see Adam Mossoff, *Patents as Constitutional Private Property: The Historical Protection of Patents under the Takings Clause*, 87 B.U. L. REV. 689, 700–11 (2007).

The exclusive nature of the property right vested in patents has long been analogized to patents for land.[2] The Supreme Court has stated that a patent for an invention "is as much property as a patent for land," and its rights "rest[] on the same foundation and [are] surrounded and protected by the same sanctions." *Consol. Fruit Jar Co. v. Wright*, 94 U.S. 92, 96 (1876); *Moore v. Robbins*, 96 U.S. (6 Otto) 530, 532 (1877). Once a land patent is issued, private disputes involving the patent do not trigger the public rights exception to Article III review. *See Moore*, 96 U.S. (6 Otto) at 532 (once a patent issues, "[i]f fraud, mistake, error, or wrong has been done, the courts of justice present the only remedy"); *cf. Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 458 (1977) ("Our prior cases support administrative factfinding in only those situations involving 'public rights,' e.g., where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights. Wholly private tort, contract, and property cases, as well as a vast range of other cases as well are not at all implicated."). As with land patents, early American third parties could challenge an invention patent's validity only in courts of equity. *See Mowry v. Whitney*, 81 U.S. (14 Wall.) 434, 440 (1871). The same was true in England at the time. *See* Mark A. Lemley, *Why Do Juries Decide If Patents Are Valid?*, 99 VA. L. REV. 1673, 1684 (2013) ("[I]n England in the eighteenth century, only chancery courts had the power to revoke a patent upon request of a private citizen.").

---

[2] A land patent is "[a]n instrument by which the government conveys a grant of public land to a private person." *Land Patent*, BLACK'S LAW DICTIONARY (10th ed. 2014).

## II. CASE LAW

### A. *Murray's Lessee* and *McCormick*

Two Supreme Court decisions inform the nature of the patent as a property right and the implications for Article III adjudication.    The first decision concerned United States customs agents who embezzled government funds.    *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272 (1855).    To recover the funds, the Treasury Department issued a distress warrant[3] against the agents.    In response to the government's attempt to recover the funds through a non-judicial process, the agents asserted a violation of Article III and the Fifth Amendment.    *Id.* at 275.    As a general rule, the Court wrote, Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty."    *Id.* at 284.    But the Court explained an exception:

> At the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.

*Id.* The Supreme Court held that the distress warrant did not violate the Constitution because the matter fell within the category of public rights.    *See id.* at 283–84.    "The point of *Murray's Lessee*," according to a later Court decision, "was simply that Congress may set the terms of adjudicating a suit when the suit could not otherwise proceed at all."    *Stern v. Marshall*, 564 U.S. 462, 489

---

[3]    A distress warrant authorizes a court officer to seize property as payment for money owed.    *Distress Warrant*, BLACK'S LAW DICTIONARY (10th ed. 2014).

(2011). Subsequent discussion of *Murray's Lessee* has been critical at times, but it nonetheless remains binding on this court. *See, e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1966–67 (2015) (Thomas, J., dissenting) (compiling various interpretations of *Murray's Lessee*).

Unlike *Murray's Lessee*, the Supreme Court's 1898 decision in *McCormick* specifically addressed patents. In *McCormick*, a patent owner applied to the patent office for a reissue that added several new claims to the existing claims. 169 U.S. at 607. While reviewing the reissue application, the examiner determined that several original claims were invalid. *Id.* Then, the patent owner abandoned his reissue application and received his original patent back from the examiner. *Id.* at 607–08. The Supreme Court granted certiorari on whether the original patent included the claims the reissue examiner had determined to be invalid. *Id.* It held that the examiner had no power to cancel previously issued claims:

> It has been settled by repeated decisions of this court that when a patent has received the signature of the secretary of the interior, countersigned by the commissioner of patents, and has had affixed to it the seal of the patent office, it has passed beyond the control and jurisdiction of that office, and is not subject to be revoked or canceled by the president, or any other officer of the government. It has become the property of the patentee, and as such is entitled to the same legal protection as other property.

> The only authority competent to set a patent aside, or to annul it, or to correct it for any reason whatever, is vested in the courts of the United States, and not in the department which issued the patent.

*Id.* at 608–09 (citations omitted).    The Court further stated that:

> the reasons given for the rejection of [the added] claims might apply equally to the same claims contained in the original patent, but with respect to such claims [the examiner] was functus officio. His opinion thereon was but his personal opinion, and, however persuasive it might be, did not oust the jurisdiction of any court to which the owner might apply for an adjudication of his rights, and, as the examiner had no authority to affect the claims of the original patent, no appeal was necessary from his decision. . . .  [T]o attempt to cancel a patent upon an application for reissue when the first patent is considered invalid by the examiner would be to deprive the applicant of his property without due process of law, and would be in fact an invasion of the judicial branch of the government by the executive.

*Id.* at 611–12.    The Court wrote in conclusion that "upon the issue of the original patent, the patent office had no power to revoke, cancel, or annul it.  It had lost jurisdiction over it, and did not regain such jurisdiction by the application for a reissue."  *Id.* at 612.    Thus, the patent owner's original claims remained valid and enforceable unless invalidated by an Article III court.

The cases *McCormick* cites in holding that an executive agency may not cancel issued patents concern the separation of powers and similar constitutional issues. For example, in *United States v. Stone*, 69 U.S. (2 Wall.) 525 (1864), the Secretary of the Interior "decided that [certain land] patents had been issued without legal authority, and *he* declared them void and revoked."  *Id.* at 528 (emphasis in original).    In finding the Secretary's revocation to be unconstitutional, the Court held that "[a] patent is the highest evidence of title, and is conclusive as

against the Government, and all claiming under junior patents or titles, until it is set aside or annulled by some *judicial tribunal.*" *Id.* at 535 (emphasis added).

> Patents are sometimes issued unadvisedly or by mistake, where the officer has no authority in law to grant them, or where another party has a higher equity and should have received the patent. In such cases courts of law will pronounce them void. The patent is but evidence of a grant, and the officer who issues it acts ministerially and not judicially. If he issues a patent for land reserved from sale by law, such patent is void for want of authority. But one officer of the land office is not competent to cancel or annul the act of his predecessor. *That is a judicial act, and requires the judgment of a court.*

*Id.* (emphasis added).

The *McCormick* Court also cited *Moore v. Robbins*, 96 U.S. (6 Otto) 530 (1877). In *Moore*, the Secretary of the Interior reversed a previous grant of a land patent. *Id.* at 531. While the Court "conced[ed]" that the Land Department may decide land disputes in the first instance, "it is equally clear that when a patent has been awarded to one of the contestants, and has been issued, delivered, and accepted, all right to control the title or to decide on the right to the title has passed from the land-office." *Id.* at 532. "Not only has it passed from the land-office, but *it has passed from the Executive Department* of the government." *Id.* (emphasis added).

> [A]ny private owner of land who has conveyed it to another can, of his own volition, recall, cancel, or annul the instrument which he has made and delivered. *If fraud, mistake, error, or wrong has been done, the courts of justice present the only remedy.* These courts are as open to the United States to sue for the cancellation of the deed or re-

> conveyance of the land as to individuals; and if the
> government is the party injured, this is the proper
> course.

*Id.* at 533 (emphasis added). The Court noted that the
existence of the Land Department's power to annul issued
patents was "utterly inconsistent with the universal
principle on which the right of private property is found-
ed." *Id.* at 534; *see also Mich. Land & Lumber Co. v. Rust*,
168 U.S. 589, 595 (1897) (holding that the Land Depart-
ment may correct mistakes in an earlier survey only
"prior to the issue of a patent"); *Shepley v. Cowan*, 91 U.S.
(1 Otto) 330, 340 (1875) ("If [Land Department officers]
err in the construction of the law applicable to any case,
or if fraud is practi[c]ed upon them, or they themselves
are chargeable with fraudulent practices, their rulings
may be reviewed and annulled by the courts when a
controversy arises between private parties founded upon
their decisions.").[4]

## B. *Patlex* and *MCM*

*McCormick* is the law of the land. Yet, this court has
twice considered *McCormick* and twice declined to follow
it for two distinct but conflicting reasons. In my view,
that two of our precedential opinions address *McCormick*
in such irreconcilable terms alone warrants an *en banc*
review.

In 1985, a three-judge Federal Circuit panel held that
Congress's 1980 reexamination statute did not violate

---

    [4]   This, of course, portends difficulties for agencies
other than the United States Patent and Trademark
Office ("PTO"), such as the United States International
Trade Commission ("ITC"), which does not administer or
grant patents yet often acts to annul them. *See, e.g.*,
*Lannom Mfg. Co. v. ITC*, 799 F.2d 1572, 1574 (Fed. Cir.
1986) (ITC finding of patent invalidity).

Article III. *Patlex*, 758 F.2d at 605. The appellant in *Patlex* argued that his Article III "rights were part of the bundle of property rights that accompanied the grant of his patents, and thus that the retroactive scope of reexamination worked a prohibited deprivation." *Id.* at 603. The panel disagreed. It wrote that the Supreme Court's decision in *McCormick* established "on constitutional grounds that an applicant for a reissue patent need not acquiesce in any finding of invalidity or unpatentability by the reissue examiner[ and] affirmed that an issued patent could not be set aside other than by an Article III court." *Id.* at 604. Nevertheless, the *Patlex* panel distinguished *McCormick* based on congressional intent to provide authority for reexaminations while retaining reissue proceedings. *Id.*

> The purpose of reissuance of patents is to enable correction of errors made by the inventor, at the initiative of the inventor. The reexamination statute's purpose is to correct errors made by the government, to remedy defective governmental (not private) action, and if need be to remove patents that should never have been granted. We do not read *McCormick* [] as forbidding Congress to authorize reexamination to correct governmental mistakes, even against the will of the patent owner. A defectively examined and therefore erroneously granted patent must yield to the reasonable Congressional purpose of facilitating the correction of governmental mistakes. This Congressional purpose is presumptively correct, and we find that it carries no insult to the Seventh Amendment and Article III.

*Id.* The losing party in *Patlex* did not petition the Supreme Court for a writ of certiorari.

Three decades later, a three-judge panel held that inter partes review ("IPR") proceedings do not violate Arti-

cle III.  *MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1292 (Fed. Cir. 2015).  The panel "s[aw] no basis to distinguish the reexamination proceeding in *Patlex* from inter partes review," because "Congress viewed inter partes review as 'amend[ing] ex parte and inter partes reexamination.'"  *Id.* at 1291 (quoting H.R. Rep. No. 112-98, 2011 U.S.C.C.A.N. 67, 75, at 45).

Beyond approving (and extending) *Patlex*, the *MCM* panel made two significant legal conclusions.  First, it stated that *McCormick* was decided on statutory, rather than constitutional, grounds.  *See id.* at 1289 (characterizing *McCormick*'s holding as depending on the lack of "statutory authorization").  According to the *MCM* panel, *McCormick* "did not address Article III and certainly did not forbid Congress from granting the PTO the authority to correct or cancel an issued patent." *Id.*

Second, the *MCM* panel explicitly found for the first time that "patent rights are public rights."  *Id.* at 1293.  As a basis for its finding, the panel noted that "[t]he patent right 'derives from an extensive federal regulatory scheme' and is created by federal law." *Id.* at 1290 (quoting *Stern*, 564 U.S. at 490).  In addition, "Congress created the PTO, 'an executive agency with specific authority and expertise' in the patent law." *Id.* (quoting *Kappos v. Hyatt*, 132 S. Ct. 1690, 1696 (2012)).  According to *MCM*, because there is "no suggestion that Congress lacked the authority to delegate to the PTO the power to issue patents, . . . [i]t would be odd indeed if Congress could not authorize the PTO to reconsider its own decisions." *Id.* at 1291.[5]

Like *Patlex*, the panel decision in *MCM* was never subject to *en banc* review.  Instead of petitioning for rehearing *en banc*, the losing party in *MCM* petitioned the

---

[5]    *See supra* note 4.

Supreme Court for a writ of certiorari. That petition was denied. *See* 137 S. Ct. 292 (2016). Thus, we have not yet considered as a full court Article III's constraints on the Patent Trial and Appeal Board's ("Board") power to cancel originally issued patents.[6]

## C. *Cascades*

In 2015, Epson America, Inc. ("Epson") and Sony Corp. ("Sony") separately petitioned for IPR of U.S. Patent No. 7,688,347 ("'347 patent"). The Board instituted both proceedings. Cascades Projection LLC ("Cascades") argued in the Sony proceeding that Article III prohibited the Board from canceling patents. The Board issued Final Written Decisions finding certain claims of the '347 patent to be unpatentable. In the Sony Final Written Decision, the Board correctly acknowledged that it "lacks authority to rule on the constitutional questions." *Sony Corp. v. Cascades Projection LLC*, No. IPR2015-01846, Dkt. No. 32, at 34–35 (P.T.A.B. Jan. 11, 2017).[7]

Cascades appeals only the issue of whether Article III prohibits the Board from canceling patent claims. It

---

[6]    Though the Supreme Court denied the petition for writ of certiorari in *MCM*, it asked for the PTO's views on this issue (and two others) in *Oil States Energy Services v. Greene's Energy Group*, No. 16-712. In *Oil States*, the patent owner did not raise an Article III challenge before the Board. The patent owner argued before the Federal Circuit that IPR proceedings violate Article III, but *MCM* was decided during the *Oil States* appeal. A Federal Circuit panel summarily affirmed *Oil States* using its Rule 36 affirmance procedure. *See Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 639 F. App'x 639 (Fed. Cir. 2016).

[7]    It appears Cascades did not raise a constitutional argument in the Epson IPR.

recognizes that it cannot prevail on appeal if *MCM* remains good law. Because a three-judge panel cannot overrule a precedential opinion, Cascades seeks initial rehearing *en banc*. We have jurisdiction under 28 U.S.C. § 1295(a)(4)(A) to address the constitutional issues.

### III. *En Banc* Action Is Necessary

The Federal Circuit internal operating procedures provide for taking *en banc* action upon: (a) necessity of securing or maintaining uniformity of decisions; (b) involvement of a question of exceptional importance; and (c) necessity of overruling a prior holding of our court. Fed. Cir. Internal Operating Procedure #13(2); Fed. R. App. P. 35(a); *Sony Elecs., Inc. v. United States*, 382 F.3d 1337, 1339 (Fed. Cir. 2004) (per curiam). Any one of these reasons is sufficient to justify *en banc* action. At least the first two are satisfied here.

### A. Panel Decisions Not Uniform

Our panel decisions holding that *McCormick* does not prohibit patent claim cancellation by non-Article III forums are not uniform. To the contrary, *Patlex* and *MCM* diverge on the approach taken to avoid the plain language of *McCormick*.

*Patlex* and *MCM* are unequivocal. *Patlex* stated that *McCormick*'s holding was "establish[ed] on constitutional grounds." 758 F.2d at 604. Moreover, the *Patlex* panel wrote that *McCormick* "affirmed that an issued patent could not be set aside other than by an Article III court." *Id.* Contrary to *Patlex*, the *MCM* panel characterized *McCormick* as a statutory case. It framed the unlawful patent invalidation in *McCormick* as "[w]ithout statutory authorization." *MCM*, 812 F.3d at 1289. And it wrote that *McCormick* "did not address Article III and certainly did not forbid Congress from granting the PTO the authority to correct or cancel an issued patent." *Id.*

What *Patlex* and *MCM* hold in common is a conclusion that reexaminations and IPRs, respectively, do not violate Article III. They both distinguish binding Supreme Court precedent, but they do so in distinct and incompatible ways. As a court of appeals, we have no discretion to distinguish Supreme Court precedent solely to avoid its holdings. At minimum, if we determine in two separate actions that a Supreme Court holding does not apply, our rationale must be uniform. Because it is not, and because the divergent rationales in *Patlex* and *MCM* are outcome-determinative, we should have granted Cascades' petition.

### B. An Exceptionally Important Question

There are two primary reasons why Cascades' petition is exceptionally important. First, the issue before us invokes the separation of powers—a fundamental constitutional safeguard. Second, it is incumbent upon us to address the private-versus-public right distinction as it relates to patents.[8] Both of these issues require us to review the IPR process in the context of the constitutional role of Article III courts.

### 1. Separation Of Powers

Congressional delegation of judicial power to non-Article III entities compromises Article III's "purpose in the system of checks and balances" and "the integrity of judicial decisionmaking." *Stern*, 564 U.S. at 484. James Madison considered the "separat[ion of] the Legislative, Executive, and Judicial powers" to be a principle "more sacred than any other." 1 Annals of Cong. 581 (1789). Since the earliest years of our nation, the Supreme Court has agreed. *See Marbury v. Madison*, 5 U.S. (1 Cranch)

---

[8] Moreover, if patents are private rights, the Board's cancellation of original patent claims should cease. Obviously, a decision on these issues could implicate areas of law beyond patents.

137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."); *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 60 (1982) (plurality opinion) ("[O]ur Constitution unambiguously enunciates a fundamental principle—that the 'judicial Power of the United States' must be reposed in an independent Judiciary.  It commands that the independence of the Judiciary be jealously guarded, and it provides clear institutional protections for that independence.").   The judicial power of Article III is not to be shared with other branches of government. *United States v. Nixon*, 418 U.S. 683, 704 (1974); *see also Stern*, 564 U.S. at 483 (the judiciary must be "truly distinct from both the legislature and the executive") (quotation marks and citation omitted).

Ever since the Supreme Court declared that the judiciary is the only branch of government empowered "to say what the law is," *Marbury*, 5 U.S. (1 Cranch) at 177, Article III courts have witnessed Congress transfer more and more of their authority to other tribunals.  Madison warned that "the Legislature would inevitably seek to draw greater power into its 'impetuous vortex.'" *Wellness*, 135 S. Ct. at 1960 (Roberts, C.J., dissenting) (quoting THE FEDERALIST No. 48, p. 309 (James Madison) (C. Rossiter ed. 1961) (1788)); *id.* ("[S]teady erosion of Article III authority, no less than a brazen usurpation, violates the constitutional separation of powers."); *see also Buckley v. Valeo*, 424 U.S. 1, 129 (1976).

While Congress has established federal courts under Article III, it also has established several tribunals outside of Article III.  Without a doubt, these able and hard-working administrative law judges allow the judiciary to keep up with its massive docket.  But I find the trend of efficiency-over-constitutionality to be troubling and in need of a clear limiting principle. *See Crowell v. Benson*, 285 U.S. 22, 56–67 (1932) ("The recognition of the utility and convenience of administrative agencies for the inves-

tigation and finding of facts within their proper province, and the support of their authorized action, does not require the conclusion that there is no limitation of their use . . . ."). These tribunals lack the protections of Article III courts, in particular, the Seventh Amendment's guarantee of a jury. We should be always wary of pawning Article III for the immediate relief of efficiency.

### 2. Patents As Private Rights

A fundamental rule of our system of government is that judicial power belongs in the judiciary, as defined by Article III. *See Marbury*, 5 U.S. (1 Cranch) at 177; *N. Pipeline*, 458 U.S. at 60 (plurality opinion); *Nixon*, 418 U.S. at 704; *Stern*, 564 U.S. at 483. That rule, however, is not absolute. The Supreme Court has recognized three exceptions: (1) territorial courts; (2) courts-martial; and (3) adjudication of public rights. *See N. Pipeline*, 458 U.S. at 71; *Stern*, 564 U.S. at 505 (Scalia, J., concurring). The first two exceptions are not at issue in this case.

In 1765, William Blackstone contrasted the three "absolute" rights of life, liberty, and property to public rights, which belonged to "the whole community, considered as a community, in its social aggregate capacity." *Wellness*, 135 S. Ct. at 1965 (Thomas, J., dissenting) (quoting William Blackstone, 1 Commentaries *119 and 4 Commentaries *5). Early examples of public rights included transportation rights and general regulatory compliance. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1551 (2016) (Thomas, J., concurring) (citation omitted). Normally only the government could vindicate a public right; private individuals could sue for violations of public rights only in rare cases upon showing extraordinary harm. *Id.*

The Supreme Court first invoked the public rights doctrine in *Murray's Lessee*. There, the Court held that Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." 59 U.S. at

284. But the Court provided an exception for public rights:

> At the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.

*Id.* Only later did the Supreme Court explain the constitutional justification for the public rights exception: sovereign immunity.

> [Claims against the United States] may arise in many ways and may be for money, lands, or other things. They all admit of legislative or executive determination, and yet from their nature are susceptible of determination by courts; but no court can have cognizance of them except as Congress makes specific provision therefor. Nor do claimants have any right to sue on them unless Congress consents; and Congress may attach to its consent such conditions as it deems proper, even to requiring that the suits be brought in a legislative court specially created to consider them.

*Ex parte Bakelight Corp.*, 279 U.S. 438, 452 (1929).

Three years after *Bakelight*, the Supreme Court decided *Crowell v. Benson*, 285 U.S. 22 (1932). Drawing on historic practice and the benefits of efficiency, the Court found that certain agency factfinding in admiralty cases, even if preclusive, did not violate Article III. *Id.* at 51–54. The Court emphasized the statute's "limited application" to legislative facts only; an Article III judge was required to review jurisdictional facts. *Id.* at 53. As the Court warned, "Congress cannot reach beyond the constitutional

limits which are inherent in the admiralty and maritime jurisdiction." *Id.* at 55. It went on:

> The recognition of the utility and convenience of administrative agencies for the investigation and finding of facts within their proper province, and the support of their authorized action, does not require the conclusion that there is no limitation of their use, and that the Congress could completely oust the courts of all determinations of fact by vesting the authority to make them with finality in its own instrumentalities or in the executive department. That would be to sap the judicial power as it exists under the federal Constitution, and to establish a government of a bureaucratic character alien to our system, wherever fundamental rights depend, as not infrequently they do depend, upon the facts, and finality as to facts becomes in effect finality in law.

*Id.* at 56–57. Finally, *Crowell* held that "the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of th[e] supreme function" of enforcing constitutional rights. *Id.* at 60.

In 1982, the Supreme Court decided *Northern Pipeline*, holding that bankruptcy courts (as then constituted) violated Article III. 458 U.S. at 87. A plurality of the Court announced "two principles that aid us in determining the extent to which Congress may constitutionally vest traditionally judicial functions in non-Art[icle] III officers." *Id.* at 80. "First, it is clear that when Congress creates a substantive federal right, it possesses substantial discretion to prescribe the manner in which that right may be adjudicated—including the assignment to an adjunct of some functions historically performed by judges." *Id.* "Second, the functions of the adjunct [decisionmaker] must be limited in such a way that 'the

essential attributes' of judicial power are retained in the Art[icle] III court." *Id.* at 81. When constitutional rights are at stake, the Court explained, "substantial inroads into functions that have traditionally been performed by the Judiciary cannot be characterized merely as incidental extensions of Congress' power to define rights that it has created." *Id.* at 84. Because the Bankruptcy Reform Act of 1978 "impermissibly removed most, if not all, of 'the essential attributes of the judicial power'" from Article III courts, it was unconstitutional. *Id.* at 87.

The Supreme Court further noted that a fundamental reason to exclude public rights from Article III is "the traditional principle of sovereign immunity, which recognizes that the Government may attach conditions to its consent to be sued." *Id.* at 67. In other words, "'public rights' are those matters involving disputes between an entity and the federal government to which sovereign immunity applies, such that Congress need not have permitted the lawsuit in the first place." Michael P. Goodman, *Taking Back Takings Claims: Why Congress Giving Just Compensation Jurisdiction To The Court Of Federal Claims Is Unconstitutional*, 60 VILL. L. REV. 83, 100 (2015). In my view, veterans benefits cases, Social Security cases, and claims against the United States in the Court of Federal Claims all involve a waiver of sovereign immunity and, in one form or the other, generally involve a private party asserting claims against the government. But query whether patents fit this category. No one sues the *government* to invalidate a third party's patent, for the patent is property of the patent owner.

The Supreme Court has acknowledged that its "discussion of the public rights exception . . . has not been entirely consistent, and the [public rights] exception has been the subject of some debate." *Stern*, 564 U.S. at 488. But the Court in recent years has given us some guideposts. The public rights exception is not limited to actions where the government is a party, *Stern*, 564 U.S. at 490,

despite the objection of at least one justice, *id.* at 503 (Scalia, J., concurring) ("I adhere to my view, however, that—our contrary precedents notwithstanding—a matter of public rights must at minimum arise between the government and others . . . .") (quotation marks, alteration, and citation omitted).   The exception is limited, however, "to cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority."  *Id.* at 490 (majority opinion).  Put another way, "what makes a right 'public' rather than private is that the right is integrally related to particular federal government action."  *Id.* at 490–91.  Despite this recent guidance from *Stern*, "the contours of the 'public rights' doctrine have been the source of much confusion and controversy."  *Wellness*, 125 S. Ct. at 1964–65 (Thomas, J., dissenting).  The confusion continues.  Lending to the confusion is the apparent conviction of some that the patent is a child, born and nurtured, of a federal regulatory scheme.  I believe that the patent derives, its characteristics indelibly secured, from a greater parent, the United States Constitution.

It is essential, therefore, to clarify the line between public and private rights.  Under current Supreme Court precedent, that line remains hazy, in particular in connection with patent rights.  Yet, as the administrative state expands and non-Article III tribunals adjudicate more disputes under the cover of the public rights doctrine, there must be vigilance in protecting Article III jurisdiction.  Each new tribunal outside of Article III should be greeted with skepticism.  Rigorously defending Article III's protections is among our most important duties, for

there exists no other voice to guard against legislative and executive excess.[9]

## IV. CONCLUSION

By its inaction today, the court ignores the plain language of binding Supreme Court precedent. It ignores whether to continue to allow a 2-year-old panel decision to supplant a 120-year-old Supreme Court holding, and it overlooks an irreconcilable divide in our panel decisions. The relationship between patent statutes and constitutional provisions is an exceptionally important issue this court, in particular, should address.

The Board's cancellation of patents through inter partes review may be the type of agency activity that "sap[s] the judicial power as it exists under the federal Constitution" and "establish[es] a government of a bureaucratic character alien to our system." *Crowell*, 285 U.S. at 57. Or, it may not. It is a question we should address.

I respectfully dissent.

---

[9]   I note that a recent Board decision interpreted the Eleventh Amendment of the United States Constitution. *See Covidien LP v. Univ. of Fla. Research Found. Inc.*, No. IPR2016-01274, Paper 19 (Order Dismissing Petitions for *Inter Partes* Review Based on Sovereign Immunity) (P.T.A.B. Jan. 25, 2017).